**Andrew Lee JONES,
Petitioner–Appellant,**

v.

**Robert H. BUTLER, Sr., Warden, Louisiana State Penitentiary, Angola, Louisiana, Respondent–Appellee.**

No. 88–3214.

United States Court of Appeals,
Fifth Circuit.

Dec. 21, 1988.

Rehearing and Rehearing En Banc
Denied Feb. 21, 1989.

John Di Giulio, Di Giulio & Bertucci, Baton Rouge, La., Judith G. Menadue (Court-appointed), Ginger Roberts Berrigan (Court-appointed), Gravel & Brady, Louisiana Capital Defense Project, New Orleans, La., for petitioner-appellant.

Dan J. Grady, III, Charles Grey, Asst. Dist. Attys., Baton Rouge, La., for respondent-appellee.

Before RUBIN, KING and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The State of Louisiana having sentenced him to death by electrocution, a state prisoner seeks habeas corpus on 18 grounds. We grant a certificate of probable cause to appeal, but, after reviewing the 70–page memorandum filed in the district court, the trial record, and the opinion of the district court, and after hearing oral argument, we find no violation of Jones's constitutional rights, and therefore affirm the district court's judgment denying him a writ of habeas corpus and vacate our order staying execution.

### I.

Andrew Lee Jones was convicted of first degree murder and sentenced to death by a jury in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, State of Louisiana. His conviction and sentence were affirmed by the Louisiana Supreme Court.[1] After the Louisiana Supreme Court denied his petition for rehearing, Jones filed a petition for certiorari in the United States Supreme Court. The Court denied the petition[2] and a later petition for rehearing.[3] Thereafter, Jones filed a petition for post-conviction relief, writ of habeas corpus and evidentiary hearing in the state district court. The state district judge denied the writ in 1987. After first granting Jones a stay of execution so that it could consider his application, the Louisi-

---

**1.** *State v. Jones,* 474 So.2d 919 (La.1985).

**2.** *Jones v. Louisiana,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986).

**3.** *Jones v. Louisiana,* 478 U.S. 1032, 107 S.Ct. 13, 92 L.Ed.2d 768 (1986).

ana Supreme Court denied the petition.[4] Jones then filed another petition for certiorari with the United States Supreme Court. That Court denied the petition [5] and Jones's petition for rehearing.[6]

Jones's execution was then scheduled for March 31, 1988. He filed an application for stay of execution and for a writ of habeas corpus in the federal district court for the Middle District of Louisiana on March 25. He also filed a motion for an evidentiary hearing and a motion to provide funds for expert assistance. In a twenty-page opinion, rendered on the afternoon of March 27, 1988, the district court denied all relief sought and also refused to grant Jones a certificate of probable cause for appeal. Jones filed a notice of appeal on March 29, and, on the afternoon of that day, a motion for a certificate of probable cause and for a stay of execution pending appeal. We granted a stay pending further order of this court in order to give us time to read the record and to study the issues.

Although Jones denies the sufficiency of the evidence to support the guilty verdict, the facts adduced at the trial support the resume given by the Louisiana Supreme Court on direct appeal:

"On February 17, 1984, eleven-year old Tumekica Jackson was living with her mother and her grandparents in the Scotlandville section of Baton Rouge. At 4:00 a.m., the grandmother discovered that the child was missing from her bedroom.

"The police discovered that someone had broken the screen of the rear den window and had opened the back door. In the muddy ground near the house, police obtained a cast of an imprint made by the left shoe from a pair of size 8½ tennis shoes. There were no signs of a struggle inside the house.

"The investigation immediately focused on defendant because his stormy romantic relationship of several years with the victim's mother had been broken off by her

the week before. The victim knew defendant well, and he had been in the home many times. On the event of the child's disappearance, defendant had called the mother's home three times and had told the grandmother that he would not be responsible for his actions if the mother continued to refuse to see him.

"About 6:30 p.m., the police went to the apartment where defendant lived with his sister, Terry Jones, and his half brother, Abraham Mingo. Defendant told the police he had been home all night, and Mingo and Miss Jones confirmed his story.

"A few hours later, Miss Jones called the police and said she may have been 'mistaken' about defendant's being home all night. After questioning her further, the police obtained a written consent to search the apartment about 10:00 a.m. When no one answered the officer's knock, Miss Jones used her key to open the door. Officers found defendant in the bathroom washing a pair of size 8½ tennis shoes. The bath tub was full of dirt and leaves. The officers seized the tennis shoes and a pair of green gloves, and they requested that defendant give them a statement at the station. After signing a waiver, defendant gave the police a tape-recorded statement in which he denied any knowledge of the offense. He was then allowed to leave with his sister.

"At approximately 6:00 p.m., Tumekica's partially nude body was found in a drainage canal. An autopsy established that the child had been beaten, raped, and manually strangled.

"The police again questioned Abraham Mingo. Although he initially told conflicting stories, he eventually gave a detailed account of his activities with defendant on Friday night and Saturday morning. According to Mingo, he and his sister (Terry Jones) were out with defendant on Friday evening, but dropped him off in Scotlandville. About 12:30 a.m. on Saturday morn-

**4.** *Jones v. Butler,* 512 So.2d 427 (La.1987); *see also State ex rel. Jones v. Butler,* 513 So.2d 1192 (La.1987) (application for supervisory and/or remedial writs and stay of execution denied).

**5.** *Jones v. Butler,* —— U.S. ——, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988).

**6.** *Jones v. Butler,* —— U.S. ——, 108 S.Ct. 1251, 99 L.Ed.2d 448 (1988).

ing, defendant returned to the apartment. Donald Nixon was with defendant, but he stayed only a short time. About 1:00 a.m., Mingo and defendant went to the Snowflake Lounge, but defendant left alone about 30 minutes later, and Mingo returned to the apartment. At some point between 4:30 and 5:00 a.m., Mingo was awakened by defendant's knock on the door, whereupon he let defendant in and went back to bed. When Mingo and defendant were alone in the apartment later that morning, defendant told him that 'he shoulda stayed home,' that 'he did something he didn't want to do,' and that he 'done fucked up.' Defendant gave Mingo a TG & Y bag and asked him to throw it away, which he did without looking inside.

"At Mingo's direction, police recovered a TG & Y bag from a dumpster near a grocery store. The bag contained socks, a pair of blue jeans and a pink sweatshirt, which were wet, muddy, and stained. Later analysis identified the stains as a mixture of blood and seminal fluid.

"Mingo also told the police about a pair of boxer shorts that he had found in the bathroom of the apartment. The shorts belonged to Mingo, but (according to Mingo) defendant had worn them on Friday night. Pursuant to Mingo's written consent, the police recovered a pair of stained brown and white boxer shorts from the trunk of Mingo's car. Analysis confirmed the presence of blood and seminal fluid on the boxer shorts.

"On the basis of this information, police obtained a warrant and arrested defendant on Sunday. After advise (sic) and waiver of his right, defendant gave a video-taped statement, in which he asserted that he and Rudolph Springer had gone to the victim's house early Saturday morning to commit a burglary. Fearful of being recognized, defendant remained in the car while Springer entered the house. When Springer returned carrying Tumekica, defendant got in the back seat and pulled his cap over his face. After a few minutes, Springer drove defendant to his apartment at his request.

That was the last time that defendant saw Tumekica Jackson.

"At trial, Abraham Mingo, Terry Jones, and Rudolph Springer testified for the state. Having been granted immunity, Mingo testified about defendant's statements and his request to dispose of the TG & Y bag. Springer denied any knowledge of the crime, and he and two corroborating witnesses established his alibi for the pertinent times. Another witness, Reginald Jackson, testified that on the night of the murder defendant asked him for a ride to Scotlandville to look for the victim's mother. He identified the tennis shoes, blue jeans, and pink sweatshirt as the clothes worn by defendant that night.

"The state also introduced the tennis shoes seized from defendant's apartment. A forensic scientist testified that these were the same size and tread design as the one which left the impression at the victim's house, but he could not make a positive identification because of the poor quality of the soil and the resultant poor quality of the cast. He did state that there were no dissimilarities.

"A serologist established that the blood on the victim's underwear and pajama bottoms, as well as that on defendant's boxer shorts and the blue jeans, came from the victim. The seminal fluid found on these articles of clothing came from an individual with Type O blood, the same type as defendant's.

"Defendant did not take the stand, and the defense presented no evidence. The jury unanimously found defendant guilty as charged of first degree murder.

"In the sentencing hearing, the state reintroduced all evidence adduced at trial. The defense presented the testimony of defendant's mother, four of his sisters, and a cousin. The jury, finding two statutory aggravating circumstances, unanimously recommended the sentence of death."

## II.

In *Barefoot v. Estelle*,[7] the Supreme Court stated, " 'where an appeal possesses

---

**7.** 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

sufficient merit to warrant a certificate [of probable cause to appeal] the appellant must be afforded adequate opportunity to address the merits, and that if a summary procedure is adopted the appellant must be informed by rule, or otherwise, that his opportunity will be limited.'"[8] Jones stressed in his brief that he intended to fully brief the issues raised "and other issues not specifically addressed herein" if a certificate of probable cause were granted. This court granted a stay of execution and thereafter heard oral argument in the case. At that time Jones, represented by counsel, was given full opportunity to address the merits of all of the issues in the case. The argument focused on the merits and the standards for granting a remand for a hearing, not on the standards for granting a certificate; Jones's 50-page brief discusses the merits; and we reviewed his habeas brief filed in the trial court. This procedure gave Jones adequate notice of our consideration of, and opportunity to argue the merits.[9] In other cases[10] we have granted a certificate of probable cause and, after considering the merits, denied relief. The briefing and oral argument procedure we have followed is, therefore, not the kind of "summary procedure" *Estelle* warned against.

We now examine the arguments advanced by Jones for granting him a writ.

### III. Suppression of Materially Exculpatory Evidence

■ The suppression of evidence favorable to the accused, material to either guilt or punishment, violates due process whether or not the prosecution acted in good faith.[11] Evidence is material only if there is a reasonable probability that the verdict would have been different had the evidence been disclosed to the defendant,[12] or, stated in another fashion, if the reviewing court's confidence in the outcome is undermined.

### A.

■ Jones contends that the state violated his right to due process by failing to give him lab reports of the serological tests conducted on the clothing allegedly worn by Jones and the victim during the crime and that these reports would have been exculpatory. If the tests did establish that Jones could not have been the perpetrator, they were clearly exculpatory. Without the test results, Jones asserts he was denied an opportunity to effectively cross-examine the state's expert witness regarding the chemical tests and to demonstrate his innocence or at least that the tests did not positively incriminate him.

Before trial, the state provided Jones with a two-page "Scientific Analysis Report," which the state claims is an accurate and complete account of all of the scientific tests performed. Jones contends that the state should have produced the lab report itself because the testimony of the state's forensic expert is inconsistent with the information in the report. The report contained the following information about the serological tests done on the clothing:

> Chemical tests indicated the presence of seminal fluid mixed with human blood on the boxer shorts, the panties, the pajama pants, the jeans, and the sweatshirt.

> Serological examination of the stains on the boxer shorts, the panties, the pajama pants, the jeans and the sweatshirt detected the presence of H antigen (type O). These stains may or may not be mixed with vaginal secretions.

> The blood of the victim is type O. Due to lack of a saliva sample from the victim, secretor status could not be determined.

**8.** *Id.* at 889, 103 S.Ct. at 3392 (quoting *Garrison v. Patterson,* 391 U.S. 464, 466, 88 S.Ct. 1687, 1688, 20 L.Ed.2d 744 (1968)).

**9.** *See* 5th Cir.R. 8.7, 8.8, 8.11.

**10.** *See, e.g., Landry v. Lynaugh,* 844 F.2d 1117, 1119 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 248, 102 L.Ed.2d 236 (1988); *Thompson v.*

*Lynaugh,* 821 F.2d 1080 (5th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987).

**11.** *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

**12.** *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985).

Serological examination of the blood and saliva of "Andrew Lee Jones" detected a type O secretor.

Further serological examination of the mixed blood and seminal stains on the boxer shorts and the panties gave results which are consistent with blood typing results expected from a mixture of the seminal fluid of Andrew Lee Jones and the blood of the victim.

(exhibit numbers omitted).

The expert testimony by the state's serologist was for the most part consistent with this report. The serologist testified that both the victim and Jones had blood type O, but that they differed in the types of enzymes in their blood. The victim's blood was enzyme type PGM–1 and Jones's was enzyme type PGM–2–1. The PGM enzyme appears in semen as well as in blood. Their blood also differed in EAP enzyme type. The serologist further testified that the stain analyzed on the boxer shorts was semen mixed with blood of the same type as the victim's and different from Jones's. He testified that the stains on the victim's panties and pajama bottoms contained blood mixed with semen of the same type es Jones's. In the one inconsistency with the report, the serologist testified that the traces of semen mixed with blood on the blue jeans and sweatshirt were not enough for typing. The serologist's testimony at trial was the same as the conclusion stated in the report: "the results I got are the results you would expect if [Jones's] seminal fluid was mixed with the [victim's] blood."

Jones claims that the blood/semen stain on the boxer shorts showed an enzyme type of PGM–1, a result that exonerates Jones because his semen contains PGM–2–1 enzyme type, which masks the presence of the PGM–1 enzyme. The record is silent about the PGM enzyme type found in the *blood/semen* stain. The serologist testified only to his conclusion that the *blood* in the blood/semen stain was the same type as the victim's and different from Jones's. From this, Jones deduces that, because Jones and the victim had the same blood type O, which could not differentiate them, the mixed stain must have shown the presence of the PGM–1 enzyme in order for the serologist to find it consistent with the victim's blood type. This deduction, however, overlooks the testimony that Jones and the victim also differed as to *EAP* enzyme type. Since the EAP enzyme appears only in blood, not semen, the serologist might have concluded that the blood was consistent with the victim's from the presence of the EAP enzyme type.

The serologist's testimony about the stains on the boxer shorts, rather than exonerating Jones, was consistent with his being the perpetrator. Furthermore, the testimony that the semen in the blood/semen stains on the panties and pajamas was consistent with Jones's was clearly inculpatory and could have been determined from the presence of Jones's *PGM* enzyme type. Thus, the state did not conceal exculpatory evidence by giving Jones the conclusions of the lab tests rather than the actual lab reports. Had Jones wanted more, he should have requested it before trial.

**B.**

 Jones also contends that the state failed to disclose other evidence tending to exonerate him. One is "information about potential jurors," a matter that can hardly be considered evidence. Another is "written or recorded statements of witnesses given to the police prior to Mr. Jones' trial," but Jones gives no reason why that evidence or the information about jurors would have been material or exculpatory, thereby failing to articulate a *Brady* claim.

Jones also contends that the state had the following evidence: that the victim's neighbor told the police that she had seen two men in a blue car across the street from her home around the time Tumekica Jackson disappeared; that a neighbor of Jones's claimed she saw Jones and Mingo outside her window arguing between 2:00 and 3:00 a.m. on the night the victim disappeared; that Jones was intoxicated at the time the police interrogated him; that

the victim's relatives said she disliked Jones; that Reginald Jackson lied to police in saying Jones was not driven to his house by Donald Ray Nixon; that Rudolph Springer and Reginald Jackson had criminal arrest and conviction records; that Mingo had been threatened with the death penalty to persuade him to testify against Jones; and that the crime was committed by someone who smoked a different brand of cigarettes from Jones's.

The state denies that it had any such evidence. Its denial is supported by the fact that the trial court held a hearing on Jones's motion for production of *Brady* material and conducted an *in camera* inspection of the prosecution's case file to determine whether the state had any exculpatory information that it had not disclosed. The file contained police reports and statements and grand jury testimony of Abraham Mingo and Terry Jones. After reviewing the file, the court ordered the release of a polygraph report on Mingo indicating that he had lied in response to questions about the case. The court also said that, should any witnesses make statements during the trial inconsistent with their prior statements, he would advise the defense and probably release the statements.

Ordinarily when the trial court has conducted an *in camera* examination we will not go beyond its finding to determine whether exculpatory materials were withheld.[13] Even assuming, however, that the allegedly suppressed evidence was in the prosecutor's possession, it is not sufficient to undermine confidence in the outcome of the trial. While recognizing that impeachment evidence is exculpatory within the *Brady* rule,[14] the evidence here described is not of the magnitude that would suggest a reasonable probability that, had it been available to Jones, the outcome of the trial would have been different.

Finally, Jones argues that the allegedly supressed evidence would have created a residual doubt at the sentencing phase of his trial and, therefore, its nondisclosure requires a reversal of his death sentence. This claim must fail, not only because we have found that the allegedly suppressed evidence is nonmaterial, but also because a defendant has no constitutional right to have such residual doubts considered in sentencing.[15]

## IV. Prosecutorial Misconduct

### A.

Misconduct by a prosecuting attorney in closing arguments may be grounds for reversing a federal conviction,[16] but improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment.[17] To establish that a prosecutor's remarks are so inflammatory, the petitioner must demonstrate that the misconduct is persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.[18]

Given our finding above that the serologist's testimony supports his conclusion that the blood/semen stains were consistent with Jones's semen type and the victim's blood type, Jones's strongest claim for prosecutorial misconduct, that the prosecutor mislead the jury with inflammatory and incorrect conclusions about the serologist's testimony, loses much of its force.

In closing argument, the prosecutor told the jury:

**13.** *See United States v. Register,* 496 F.2d 1072, 1081 (5th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975).

**14.** *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380.

**15.** *Franklin v. Lynaugh,* ___ U.S. ___, 108 S.Ct. 2320, 2327–28, 101 L.Ed.2d 155 (1988).

**16.** *Berger v. U.S.,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

**17.** *Felde v. Blackburn,* 795 F.2d 400, 403 (5th Cir.1986), *cert. denied,* ___ U.S. ___, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987).

**18.** *Id.*

You heard Jerry Miller testify from the crime lab. And we know that the defendant and the victim are both O. But Jerry Miller was able ... to do further groupings [i.e., the enzyme typing]. And they were able to tell the different blood groupings from the O victim and the O defendant. And the blood on those boxer shorts belonged to Tumekica Michelle Jackson. And you also heard him testify that the seminal stains on those boxer shorts are characteristic of the seminal stains which this man over here would leave. There were also seminal stains found on the sweatsuit, the shirt—the pink sweatshirt—the blue jeans, the panties. There was blood from the victim on her panties and her pajamas. And the State submits that ... there is no doubt whatsoever that this man over here committed this offense, no question about it.

In rebuttal argument, the prosecutor stated:

Furthermore, we know that the defendant committed this offense because, although the blood typing of fifty percent of the [black] population is O ... you heard Jerry Miller testify that further break down the blood into groupings [sic]. The victim was O in this case and the defendant was O in this case. But they did not have the same type of blood groupings. The blood on the boxer shorts was that consistent with the blood grouping of the victim's blood, not the defendant's blood, but victim's blood although both of them were type O. So the victim's blood was on those underwear. And Jerry Miller testified that there was no doubt that there was blood stains and seminal fluid on the underwear, the boxer shorts, and sweatshirt and the blue jeans which were, as he testified, consistent with that of Andrew Lee Jones and the victim's, Tumekica Jackson.

■ The prosecutor's summary of the serologist's testimony is accurate on all but two points. First, the serologist did not state that it was the victim's blood on her panties and pajamas. He testified that the *mixed blood and semen stains* on the

panties and pajamas were consistent with Jones's semen type. Since the clothes had been identified as belonging to the victim, the inference that it was her blood was reasonable. Second, the serologist did not testify that the blood and semen stains on the jeans and sweatshirt were consistent with being from the victim's blood and Jones's semen; he specifically stated that those stains could not be typed. Since he did conclude that the stains on the other clothes were consistent with Jones's semen type and the victim's blood type, the argument about the jeans and sweatshirt was cumulative, but not enough so to be prejudicial. Thus, we find neither inaccuracy so egregious as to have been unconstitutional prosecutorial misconduct.

Jones also claims that other misrepresentations, not objected to at trial, were made in the prosecutor's closing argument. Several of the challenged statements, however, were permissible inferences or minor misstatements, perhaps inadvertent, but in any event not so egregious as to constitute a denial of due process.

At trial Abraham Mingo, Jones's brother, identified a pair of boxer shorts as his own and explained that he had found the shorts on the morning of February 18, 1984, in the bathroom and had put them in a bag in the trunk of his car. He further testified that Jones had worn the boxer shorts on Friday, February 17. In closing argument the prosecutor told the jury:

Now Abraham Mingo testified that he was in the bathroom, he's combing his hair out, and right there on the door—on the floor he saw his boxer shorts and he picked them up, didn't look at them. He knew that Andrew had them on the Friday before. And he threw them in the back of his car where he keeps all his washing things where he was taking them to wash at his mother's house or his girlfriend's house or somebody's house. And the police got a voluntary consent to search for them in his car which he admitted that he signed voluntarily....

And what did they find on the front of those boxer shorts which the defendant,

Andrew Lee Jones, had on that Friday night? And how do we know he had them on? Because his brother, Mingo, said he saw them on him that Friday night. That's how we know he had them on because they were all sitting around drinking beer and he said, "Why don't you get a job so you can buy your own drawers and wear your own underwear?" He remembered specifically seeing those underwear on his brother that night, that Friday night.

The prosecutor's comments were an elaboration of Mingo's testimony but we find in them neither any intentional misstatement nor suggestion beyond the permissible.

■ Although other witnesses had described the clothing Jones was wearing on the night of the crime, his brother, Mingo, did not. The prosecution, however, said in closing argument:

> [Defendant] had on that pink sweatshirt.... He had on those blue jeans and those white Converse tennis shoes.... So we know what he was wearing on Friday night through the testimony of Jackson and through the testimony of Mingo.

This comment was apparently inadvertent and, in any event, harmless, for other witnesses had indeed testified that Jones was wearing the garments so described.

Jones claims that the prosecutor improperly mislead the jury about the testimony that Jones was drunk. On the contrary, the prosecutor referred to that testimony:

> [T]here's no evidence that he was staggering around. Now, Mingo said that he had been drinking and I think one other, uh, Reginald Jackson said that he had been drinking and he might have been drunk earlier in the evening. But they didn't see him after, Reginald Jackson testified, I think, it was like 8:30, 9:00 or 10:00. And Abraham Mingo didn't see him again— when he left the Snowflake Lounge at 1:30 he didn't see him again until 5:00 in the morning. He doesn't know what kind of condition he was in. He might have been perfectly sober and knew exactly what he was doing. So there's no evidence whatsoever that he

was staggering or losing his motor functions. [Defense counsel] just kinda threw in that.... Don't be mislead by that.

This was permissible argument. The jury might have concluded that, even if Jones had been drunk earlier, he had sobered somewhat or that, even if still under the influence of alcohol, he was not "staggering around."

■ We find no impropriety in the prosecutor's statement that the state is not required to prove motive. This did not, as Jones' contends, have a tendency to confuse the jury concerning their obligation to find specific intent, a matter clearly and accurately covered in the court's instructions to the jury.

Jones contends that the prosecutor elicited false testimony about the condition of the blue jeans and sweatshirt and then exploited that false evidence in her closing remarks. A policeman testified at trial that the clothing allegedly worn by Jones and thrown away by Mingo were "real wet" and muddy. According to Jones, a police report, not introduced in evidence, indicates that only the legs of the blue jeans near the bottom were wet and the sweatshirt had a small amount of mud on it. The prosecutor stated in closing argument:

> Those clothes were soaking wet and they were muddy from head to toe in the TG & Y bag when Officer Thompson and Officer Cochran retrieved them from that dumpster....

We fail to find any prejudice in this minor discrepancy.

■ Defense counsel had challenged the failure of the police to take blood samples from other persons initially under investigation, Abraham Mingo and Rudolph Springer. The prosecutor responded:

> The reasons the police didn't draw blood from Mingo and Springer is because they had already checked out their story; they had already checked with Rogers and Samuel. They had already completed their investigation. They knew that Mingo and Springer didn't commit this

offense, that's why blood wasn't drawn from them. That's why their blood wasn't sent for comparison. They knew they had the right man.

While this attributes to the police a reason for their conduct not adduced in evidence, we reject the contention that this asks the jury to convict Jones because the police believed him to be guilty. The argument was made to counter the suggestion that someone other than Jones had committed the offense. The prosecutor reminded the jury that another suspect, Rudolph Springer, had an alibi, corroborated by Adrian Rogers's and Joyce Samuels's testimony. The statement does indeed say that the police "knew they had the right man," but, in context, we do not consider it an argument to "trust the police" or to accept their conclusions.

We turn to the remaining challenged remarks. The prosecutor elaborated on the testimony of Jones' brother, Abraham Mingo, concerning what Jones said to Mingo after the death of the victim.

*Abraham Mingo's trial testimony*

[Andrew Jones said] he shoulda stayed home; he did something he didn't want to do. He said, "Shit, fuck, I done fucked up."

*Prosecutor's statement*

And Andrew Lee Jones stated to [Mingo] that, "I really messed up bad, I really messed up. I done something last night I shouldn't have done. I done hurt somebody I didn't mean to hurt." And he called the name and it was a funny name; it was a name that he couldn't remember. And I submit to you that what he was speaking of was Tumekica, Tumekica Jackson is who he was speaking of. He done hurt somebody he didn't mean to hurt. He done done something he shouldn't have done.

In rebuttal argument, the prosecutor repeated this version:

Mingo's statement was, "I done done something bad. I done done something last night I shouldn't have done. I done hurt somebody I didn't mean to hurt." And then he called somebody's name, a name he hadn't heard of.

The difference between the comment and the testimony, however, does not appear to have been intentional or to have been made for the purpose of inflaming the jury.

In closing argument, the prosecutor expressed her belief in Jones's guilt in the following passages:

[O]n Sunday [the day presiding Judge Hymel signed the warrant and petitioner was arrested] there wasn't any doubt in anybody's mind who committed this offense. Andrew Lee Jones committed the offense and the State knew it and the police officers knew it. They knew it and they secured the warrant for his arrest on Sunday and that's when he was placed under arrest. And the State has never deviated from that from that time on. There's never been any doubt in the State's mind who was guilty of this offense.

\* \* \* \* \* \*

And the reasons I didn't charge [Abraham Mingo] was because I wanted to use his testimony because I knew I had the right man and I wanted to make sure and do everything in my power that that man was punished for the thing that he did, and bring this case and present as much evidence to you as I can. And that's why the brother, Abraham Mingo, wasn't charged; that's exactly why he wasn't charged. I'll tell you that right now.

\* \* \* \* \* \*

I'll tell you this, the evidence in this case, the physical evidence and the testimonial evidence in this case is overwhelming. It's more than I've ever seen in any case. It's tremendous. And I'll tell you, the four things or five things that we know—the reason we know that this defendant is the one that committed this offense are because....

This is impermissible argument. We do not find, however, that the prosecutor's comments, evaluated as they must be in the context of the trial as a whole including

the prosecutor's entire closing argument,[19] are persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.

### B.

Jones also cites alleged instances of improper prosecutorial comment at the sentencing phase.

■■ First, Jones claims that the prosecutor made an improper "war on crime" argument:

> People, especially children in the society, have a right in this society to be able to go to bed in their homes at night and feel safe and secure, to not have to worry about people breaking in and taking them out into the middle of the night and killing them.

We have found more extensive and vigorous pleas for law enforcement permissible, and therefore find no error here.[20]

■■ Second, Jones asserts that the prosecutor improperly argued that voluntary intoxication and mercy and sympathy are not appropriate mitigating circumstances, prejudicing Jones's constitutional right in a capital case to have "any relevant mitigating evidence" considered by the sentencing jury.[21]

In response to defense counsel's presentation of mitigating circumstances, the prosecutor said

> We can't refuse to give the criminals the sentence that they deserve based on the fact that their families will be hurt.... The fact that the families are hurt doesn't lessen what they've done and it should not lessen the penalty. We cannot excuse the criminal actions of someone because they drink. We cannot excuse somebody's criminal actions because he's a good babysitter.... This is not

acceptable mitigating circumstances, in the state's opinion.

We do not find here, however, that the prosecutor's statements were improper. Read in context, she was arguing not that the jury could not find mercy and intoxication mitigating circumstances, but that they should not do so here. Furthermore, the court properly instructed the jury to consider any mitigating circumstances before deciding to impose a sentence of death.

■■ Third, Jones cites as error, the prosecutor's statement:

> Also, too, I would like to state that if, in fact, you do return the death penalty that yours will not be the last word. Every sentence is reviewed by the Supreme Court....

This argument was improper.[22] The prosecutor may not minimize the jury's sense of responsibility for a death sentence by referring to the availability of appellate review.

Defense counsel immediately objected and the jury was removed from the courtroom for arguments on the objection. When the jury returned, the Court instructed the jury "to disregard the last comment, the statement of the prosecutor." Jones contends that the court's admonition was insufficient to cure the prejudice to him from the prosecutor's improper argument.

To the contrary, however, we find, as did the Louisiana Supreme Court, that the comment did not violate the rule of *Caldwell v. Mississippi*.[23] We accept the reasoning of the Louisiana Supreme Court:

> The brief remark in the present case, unlike the comments in the *Caldwell* case, was not left uncorrected. When the prosecutor in the present case first mentioned appellate review, defense counsel immediately cut her off. The trial judge not only sustained the objec-

---

19. *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir.1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

20. *See United States v. Caballero*, 712 F.2d 126, 131 (5th Cir.1983).

21. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978).

22. *Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985).

23. *Id.*.

tion, but also admonished the jury to disregard the comment. Under these circumstances, there was no reasonable possibility that the comment led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere" or deprived the defendant of a fair trial in the sentencing hearing.[24]

The statement did not diminish the jury's appreciation of the significance of their role in the sentencing process, nor did the statement diminish the jury's sense of responsibility for its sentence.

### V. Sufficiency of the Evidence

Considered in the interpretation most favorable to the jury verdict, as it must be,[25] the evidence, while circumstantial, was enough to enable a rational juror to conclude beyond a reasonable doubt that Jones was guilty of first degree murder. Jones argues that Louisiana imposes a higher standard of proof than that of *Jackson v. Virginia*[26] in cases of circumstantial evidence. Whatever the state law requires, however, the federal court's habeas review is limited to ensuring that *Jackson* is satisfied.

 Under Louisiana law,[27] the state was required to prove that Jones had specific intent to kill or inflict great bodily harm and was engaged in aggravated rape when he did the killing. The testimony that the victim was under twelve and that she had been raped established the element of aggravated rape. Testimony that the victim was beaten, raped, and strangled supports beyond a reasonable doubt the inference that Jones had the specific intent to kill or inflict great bodily harm.

The crucial factual dispute relates to identity: Jones argues that there was a reasonable doubt whether he, rather than Abraham Mingo or Rudolph Springer, committed the crime. The jury, however, could credit the testimony of the prosecutor's witnesses linking Jones to the crime. Min-

go testified that Jones had asked him to dispose of the gym bag in which the blood and semen-stained clothes were found and had told Mingo on the morning of February 18, 1984, that he had "fucked up" and done "something he didn't want to do." Springer presented an alibi, corroborated by two witnesses, that he was at a party all night and never saw Jones. The jury could accept this story and therefore reject Jones's account that he and Springer had kidnapped Tumekica Jackson but thereafter Springer had taken her off alone. Reginald Jackson testified that Jones had asked him for a ride to Scotlandville that night to look for the victim's mother and had been wearing the blue jeans, tennis shoes, and pink sweatshirt found in the gym bag. The victim's grandmother testified that Jones called her three times on February 17, 1984, and said that he "done got crazy" because he had not seen the victim's mother since their breakup a week before and that he would not be responsible for his actions. A police officer testified that Jones was found on the morning of February 18 hiding in his bathroom with wet Converse sneakers, similar in size and tread to shoe prints found outside the victim's house. The serologist testified that the tests done on the mixed blood and semen stains on the victim's panties and pajama bottoms were consistent with Jones's semen type.

The evidence that Jones argues casts doubt on his being the perpetrator—that the clothes fit Mingo better than him, that the victim disliked him and would not have quietly gone along with him, that she was too big for him to forcibly carry away, and that he was too intoxicated to have been able to commit the offense—is insufficient to render the jury's conclusion unreasonable.

### VI. Jury Selection

 Jones asserts that, because the trial court wrongly denied a defense chal-

**24.** *State v. Jones*, 474 So.2d 919, 931–32 (La. 1985).

**25.** *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

**26.** *Id.*

**27.** La.Rev.Stat.Ann. 14:30(A)(1).

lenge for cause, he was forced to use one of his eight peremptory challenges to exclude a prospective juror he claims was biased. The prospective juror, Martha Pate, had lived near the victim and knew her by sight, had visited the funeral home to view her body, had worked at Angola prison for eighteen months six years before the trial, and had worked four years earlier as a hospital lab clerk for a doctor who testified for the State.

Under Article 797 of the Louisiana Code of Criminal Procedure, a juror may be challenged for cause if, among other things, the juror is "not impartial, whatever the cause of his partiality." Implicit then in not excusing her for cause, was a finding that Pate was not biased. This state court finding is a factual one that is accorded a "presumption of correctness" under 28 U.S.C. § 2254(d). Even though the court made no express findings of non-bias, the questioning the ruling reflected is sufficient.[28] The finding of impartiality is therefore "presumed correct" unless it is "not fairly supported" by the record viewed "as a whole."[29] Pate's statement that her previous jobs and her curiosity about the victim would not prevent her from deciding the case impartially supports the trial court's denial of the defense challenge for cause.

Jones also asserts that the prosecutor intentionally exercised peremptory challenges to exclude blacks from the jury, thereby denying him equal protection of the laws. As a result, Jones, a black man, was tried by an all white jury despite the fact that more than 33% of the community from which the jury was selected is black. The record, as supplemented on appeal, shows that three of the four veniremen struck by the state in peremptory challenges were black.

In *Batson v. Kentucky*,[30] the Supreme Court held that a state criminal defendant could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made a prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges.[31] *Batson* applies retroactively to all cases pending on direct review or not yet final when the judgment was rendered.[32] Because his writ of certiorari was still pending in the Supreme Court when *Batson* was decided, Jones argues that he is entitled to an evidentiary hearing on his *Batson* claim. In response, the state asserts that the *Batson* claim is barred by Louisiana's contemporaneous-objection rule because no objection was made at trial to any use of peremptory challenges due to alleged race discrimination.

In *Wainwright v. Sykes*, the Supreme Court held that federal-habeas-corpus review of a state convict's constitutional claim is barred when the state court had previously refused to consider the claim on the merits because of noncompliance with a state contemporaneous objection rule "absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation."[33] After *Sykes* a federal habeas court is called upon to make the following analysis before granting relief:

> First, it must decide whether the state court applied the procedural bar in denying the petitioner's federal constitutional claim. Second, assuming that a state court applied the procedural bar, the federal court must consider whether there was adequate cause for the petitioner's failure to comply with the procedural rule. And third, assuming adequate cause, the federal court must decide

---

**28.** *Wainwright v. Witt*, 469 U.S. 412, 430, 105 S.Ct. 844, 855, 83 L.Ed.2d 841 (1985).

**29.** 28 U.S.C. § 2254(d)(8).

**30.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**31.** *Id.* at 95–99, 106 S.Ct. at 1722–24.

**32.** *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

**33.** 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed. 2d 594 (1977).

whether the petitioner suffered actual prejudice from the alleged constitutional violation before habeas relief may be granted.[34]

The Louisiana district court denied Jones's petition for post-conviction relief in one sentence, which began, "Having considered all the claims raised on their merits...." The Louisiana Supreme Court made no statement in its denial of a writ of review. When a state court reaches the merits rather than relying on a procedural bar, we are also free to do so.[35] This circuit has held, however, that "[t]he state judge's mere use of the word 'merit' in denying the collateral attack does not justify a federal judge to conclude that the state judge ignored his state law and secretly weighed [the merits of the claim]."[36] This panel is obliged, therefore, to weigh the same considerations as those involved when a state court has been silent as to the basis for its decision.[37] We consider whether the state courts regularly apply the contemporaneous-objection rule to preclude review of the merits of similar claims, whether the history of the case suggests that the courts were aware of the procedural default, and whether the state court's silence suggests a decision on procedural grounds or on the merits.[38]

Article 841 of the Louisiana Code of Criminal Procedure provides, "An irregularity or error cannot be availed of after the verdict unless it was objected to at the time of occurrence." The Louisiana Supreme Court has applied their contemporaneous objection rule in pre-*Batson* cases challenging the prosecutor's use of peremptory challenges to exclude blacks from the jury.[39] The state appeals court has applied the contemporaneous objection rule as a procedural bar to raising a *Batson* issue on collateral attack.[40] We therefore conclude that ordinarily the Louisiana Supreme Court would not excuse a procedural default to reach the merits of a *Batson* claim.

The remaining considerations are less helpful in deciding whether the bar was applied here. Because the state did not respond to Jones's habeas petition in either the district court or the Supreme Court, we do not know whether the courts were aware of the procedural default. Similarly, since the use of the word "merit" is not dispositive,[41] the district court's one-line statement in dismissing the petition does not suggest whether procedural grounds were decisive.

Evaluating all of the considerations, however, we find that the most probable conclusion is that the Louisiana courts knew and applied Louisiana law to the effect that petitioner waived error by failing to object to the peremptory challenges.

Having determined that the state applied a procedural bar, we now consider whether there was adequate cause for the petitioner's failure to comply with the contemporaneous-objection rule.[42] Jones does not offer any reason for his failure to object. Because Jones's trial took place before *Batson* was decided, however, we consider whether Jones's failure to anticipate the *Batson* decision, "an explicit and substantial break with prior precedent",[43] is just cause for failing to object to the State's use of peremptory challenges.

**34.** *Preston v. Maggio,* 705 F.2d 113, 115 (5th Cir.1983).

**35.** *See Tasco v. Butler,* 835 F.2d 1120, 1122 (5th Cir.1988).

**36.** *Rollins v. Maggio,* 711 F.2d 592, 593 (5th Cir.1983).

**37.** *See id.* at 594.

**38.** *Tasco v. Butler,* 835 F.2d 1120 (5th Cir.1988); *Preston v. Maggio,* 705 F.2d 113, 116 (5th Cir. 1983).

**39.** *See State v. Spencer,* 446 So.2d 1197, 1200 (La.1984); *State v. Qualls,* 377 So.2d 293, 298 (La.1979).

**40.** *State v. Evans,* 506 So.2d 1283, 1287 (La.App. 1987).

**41.** *See Rollins v. Maggio,* 711 F.2d 592, 593 (5th Cir.1983).

**42.** *See Sykes,* 433 U.S. at 74, 97 S.Ct. at 2499–2500.

**43.** *Allen v. Hardy,* 478 U.S. 255, 257, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986).

While the Supreme Court has said that "[w]e might hesitate to adopt a rule that would require trial counsel either to exercise extraordinary vision or to object to every aspect of the proceedings in the hope that some aspect might mask a latent constitutional claim,"[44] that concern is not present here. At the time of Jones's trial, the claim was familiar and had been asserted in many other cases. *Swain v. Alabama*[45] laid the basis for Jones' constitutional claim by holding that the use of peremptory challenges to strike black jurors on account of race violates the Equal Protection Clause.[46] Although *Swain* also held that a defendant could not establish such a violation solely on proof of the prosecutor's action at his own trial,[47] defendants continued to challenge the use of peremptory challenges to strike blacks from the venire. The prevalence of these objections suggests that Jones had the tools to construct his constitutional claim. "Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default."[48]

The procedural default, for which Jones did not show cause, was reason for the district court to dismiss the *Batson* claim without reaching the merits.

## VII. Aggravating circumstances

The jury found two aggravating circumstances: that Jones killed the victim in the course of an aggravated rape and that the offense was inflicted in "an especially heinous, atrocious, or cruel manner." Jones contends that the evidence was insufficient under the Louisiana Supreme Court definition of cruelty and heinousness to warrant the finding of the second aggravating circumstance, which requires evidence that the defendant "tortured" the victim.[49]

Having found the evidence sufficient to support the aggravated-rape finding, the Louisiana Supreme Court did not consider the sufficiency of the evidence to support heinousness. Nor do we need to reach the issue. This court has held, and it is therefore the law of the circuit, that a death verdict must stand even if the jury finds more than one aggravating circumstance and the finding as to all but a single circumstance is invalid.[50] In *Wilson v. Butler* the petitioner argued, as Jones does here, that Louisiana requires the jury to weigh aggravating circumstances against mitigating ones in such a way that predicting the jury's decision based on fewer aggravating circumstances is impossible. We explicitly found that "an independent review of the Louisiana sentencing statute, as well as Louisiana case law, reveals that Louisiana law does not require weighing of aggravating against mitigating circumstances."[51] Since the record supports the jury's finding that Jones committed the offense during an aggravated rape, the sentence is upheld.

Jones urges that the Supreme Court's recent decision in *Johnson v. Mississippi*,[52] requires us to reconsider our doctrine that one valid aggravating circumstance will support a death sentence. In *Johnson*, the aggravating circumstance that proved in-

---

**44.** *Engle v. Isaac*, 456 U.S. 107, 131, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982).

**45.** 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

**46.** *Id.* at 220–26, 85 S.Ct. at 835–39.

**47.** *Id.*

**48.** *Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982).

**49.** *State v. Sonnier*, 402 So.2d 650, 658–59 (La. 1981), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983).

**50.** *See Wilson v. Butler*, 813 F.2d 664, 673–74, *reh'g granted on other grounds*, 825 F.2d 879 (5th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988).

Judges Rubin and King continue to adhere to their dissent in *Williams v. Maggio*, 679 F.2d 381 (5th Cir.1982) (en banc), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

**51.** *Id.* (citations omitted).

**52.** — U.S. —, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

valid was the defendant's previous violent-felony conviction, which had just been reversed and vacated. The other aggravating circumstances—that the murder was committed in order to escape custody and that it was heinous—were unrelated and rested on different facts. In that case, there was strong reason to believe that the prior conviction might have made the difference between life imprisonment and death in the jury's minds.[53]

In contrast, here we have two aggravating circumstances—aggravated rape and heinousness—that essentially rest on the same facts, that Jones kidnaped, raped, beat, and killed an eleven-year old girl. It is hardly likely that the jury was influenced to inflict the death penalty by the fact that it was able to apply two labels rather than one to essentially the same set of facts. If an aggravating circumstance is invalidated, and it rests on the same grounds as valid aggravating circumstances, the sentence is still valid.

## VIII. Assistance of Counsel

To prevail on this claim, Jones must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.[54] A "court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."[55] "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[56]

In reviewing the performance of counsel it is incumbent on the petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[57] Jones's specific allegations in this case were summarized by the district court as follows:

(1) The lead counsel had only three years experience and was ineffective per se due to his inexperience. The court also appointed the public defender, Alton Moran, to represent the petitioner. It is clear from the record that Moran was present at and participated in the pretrial and trial proceedings.

(2) The attorneys should have sought expert assistance to impeach the state's witnesses.

(3) Counsel failed to investigate and present evidence on Jones's mental and physical condition at the time he gave his statements.

(4) Counsel failed to object to certain evidence.

(5) The voir dire examination was inadequate.

(6) The investigation conducted by counsel was inadequate.

(7) The closing argument was inadequate.

(8) Counsel's performance at the penalty stage was deficient.

(9) Counsel failed to have an independent psychiatric evaluation of Jones's mental condition and problems.

(10) Counsel should have obtained a continuance of the sentencing hearing.

(11) Counsel should have requested additional jury instructions.

Prior to the trial, defense counsel filed numerous written motions, including the following: motion for continuance of trial date; motion for discovery, which included 23 separate requests; motions to suppress confessions; motion for independent and sequestered voir dire; motion for production of *Brady* material; motion for a bill of particulars; and motion for bail. After the state had filed answers to the *Brady* and discovery motions, counsel filed an objec-

---

53. *See* 108 S.Ct. at 1989.

54. *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

55. *Id.* at 690, 104 S.Ct. at 2066.

56. *Id.* at 694, 104 S.Ct. at 2068.

57. *Id.* at 690, 104 S.Ct. at 2066.

tion to the state's answers. Counsel also filed a motion for additional peremptory challenges.

■ Counsel for the defense apparently made a strategic decision to concede the death and rape of the victim and concentrate on the identity issue. This cannot be considered an inappropriate tactic. During the trial defense counsel aggressively cross examined the state's witnesses and made numerous objections, many of which were successful, to the evidence that the state sought to introduce.

At the penalty stage, the state presented no evidence other than adopting testimony presented at the guilt phase of the trial. Defense counsel not only objected to that evidence, but also sought to have the judge give nine separate special jury charges. The judge refused to change his charge which apparently had been affirmed by state appellate courts in other cases. The strategy of counsel for Jones at the penalty stage was summarized by the district court as follows: Jones was depicted as someone deeply in love with his girlfriend and thereafter, a man who was physically and mentally affected by a termination of their relationship. He was portrayed as a young man with a limited education, who loved and was loved by his family. His counsel offered evidence that Jones had been drinking on the night of the crime and on the date the statements were made. They also presented evidence that he loved children, babysat for children, and treated children in a kind and loving manner. The witnesses told the story of Jones's large family, his role in the family, and his inability to keep a job. These factors were stressed in counsel's closing argument. While current counsel now contends that Jones's trial counsel should not have made reference to the sympathy for an eleven-year old victim, this sentence is taken out of context. It was clear that counsel was seeking to remove the sympathy factor and encourage the jury to reach a proper verdict without showing sympathy for the victim.

In addition to the efforts at trial, defense counsel preserved forty errors and urged them on appeal. Considering all of the evidence in this case, the district court correctly considered that Jones was not denied effective assistance of counsel and was not prejudiced by the actions of his court-appointed counsel.

## IX. Instructions on Mitigating Circumstances

Jones argues that the jury instructions at the sentencing phase were insufficient to enable them to give his mitigating evidence "independent mitigating weight" as constitutionally required by *Lockett v. Ohio*.[58]

The court instructed the jury:

You are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed.... Before you decide that a sentence of death should be imposed you must unanimously find beyond a reasonable doubt that at least one statutory aggravating circumstance existed.... If you find beyond a reasonable doubt that any of the relied on statutory aggravating circumstances existed you may consider imposing a sentence of death. If, however, you do not unanimously find beyond a reasonable doubt that any of the relied upon statutory aggravating circumstances existed then life imprisonment without benefit of probation, parole, or suspension of sentence is the only sentence that may be imposed. However, even if you find the existence of an alleged aggravating circumstance relied on by the State you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed.... You are not limited only to those mitigating circumstances which are specifically defined because ... you can consider any other relevant mitigating circumstance which you feel should mitigate the severity of the penalty to be imposed.

Jones claims that the instruction was improper because (1) the jury might speculate that Jones had to prove mitigating factors beyond a reasonable doubt; (2) the jury

---

**58.** 438 U.S. at 602, 605, 98 S.Ct. at 2963, 2965, 57 L.Ed.2d 973 (1978).

was not told it had the option to exercise mercy and return a life sentence even if no mitigating factors were present; (3) the jury was not instructed to weigh aggravating against mitigating circumstances; (4) the jury would not know whether to weigh the relative number of aggravating and mitigating circumstances or their relative substantiality; and (5) the jury was not told that it was not bound by its finding of aggravating factors at the guilt phase. The trial court denied Jones's request for instructions that he claims would have cured each of these infirmaries.

In examining Jones's first ground of error, then, it is not relevant that the Louisiana Supreme Court has stated[59] that there is no burden of proof on the defendant in establishing mitigating circumstances. The standard we follow in interpreting jury instructions is " 'what a reasonable juror could have understood the charge as meaning,' " not what the state courts declare their meaning to be.[60] If there is a substantial possibility that the jury may have rested its verdict on an improper ground, we must remand for resentencing.[61]

Jones argues that since the only burden of proof mentioned in the instructions is the beyond-a-reasonable-doubt standard for establishing aggravating circumstances, the jury might reasonably conclude that Jones had to establish mitigating circumstances to that degree of certainty. This argument is relevant only if the state disputed the existence of a mitigating circumstance. Jones offered as mitigating circumstances that he had no significant prior criminal activity, that the offense was committed while he was emotionally distressed about breaking up with the victim's mother, that he had been drinking on the night of the crime, and that he loved and was loved by his family. The state did

argue at sentencing that no evidence was presented of any emotional or mental disturbance, but did not challenge Jones's evidence about his relationship with the victim's mother on which his alleged emotional state was based. Thus, the failure to instruct the jury that Jones had no burden of proof in establishing mitigating circumstances did not prejudice Jones, even if the jury believed that it had to prove the existence of mitigating circumstances beyond a reasonable doubt. A reasonable juror might conclude that, because Jones's evidence was undisputed, he had established those mitigating circumstances.

Jones's second contention is that the court erred in not instructing the jury that it had the option to exercise mercy even absent other mitigating factors. In *California v. Brown*,[62] the Supreme Court upheld an instruction not to be swayed by "mere sentiment [or] sympathy," concluding that there is no constitutional requirement that the jury consider "emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase."[63] Since the jury was allowed to consider all mitigating circumstances, it was allowed to respond to the sympathy that would properly arise from them.

We reject Jones's contention that the court erred in denying him an instruction that the jury must weigh aggravating circumstances against mitigating circumstances in reaching a sentencing recommendation. As we have stated earlier, Louisiana law does not require the weighing of aggravating against mitigating circumstances.[64] Unless the jury is precluded from considering mitigating circumstances,[65] the Constitution does not require a state to adopt specific standards for in-

---

59. *See State v. Sonnier,* 402 So.2d 650, 657 (La. 1981), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983).

60. *Mills v. Maryland,* __ U.S. __, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988) (quoting *Francis v. Franklin,* 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985)).

61. *Id.,* 108 S.Ct. at 1867.

62. 479 U.S. 538, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987).

63. *Id.*

64. *See supra* note 48 and accompanying text.

65. *See Mills v. Maryland,* __ U.S. __, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

structing the jury in its consideration of aggravating and mitigating circumstances.[66] Since the jury was instructed here, as required by the Louisiana sentencing statute,[67] to consider mitigating circumstances before deciding on a sentence, the instructions were constitutional.

We cannot accept Jones's claim that the instructions might have misled the jury into thinking it was supposed to weigh the number, rather than the weight, of the aggravating circumstances against the mitigating ones. It strains credulity that a reasonable juror would think it had to ignore how important it viewed an aggravating or mitigating circumstance, and treat every circumstance, once proved, as of equal force in assessing a jury punishment.

As to Jones's assertion that the jury might have thought that it was bound by its finding of aggravating factors at the guilt stage, the language of the instructions makes such a belief highly unlikely. The instructions told the jury it had to find an aggravating factor beyond a reasonable doubt and used the conditional "if" to leave open the possibility that it would not.

### X. Admission of Photographs

Jones claims that the trial court denied him due process of law by admitting, at both the guilt and penalty phases, photographs of the victim's body whose prejudicial effects outweighed their probative value.

■ The photographs in question, a close up of the cut on the victim's gum with the lips pulled back, a close up of the buttocks with blood trickling down from the genital area, and of the victim's legs spread apart to show her vagina, were pro-

bative of the elements of first degree murder in showing Jones's specific intent to kill or inflict grave bodily harm and in showing that the victim was raped. The only issue is whether they were unduly inflammatory. We do not find that the inflammatory nature so plainly exceeds evidentiary worth as to violate due process. Moreover, the balancing of relevance and prejudice is generally a state evidentiary issue which federal courts do not review.[68]

### XI. Other Issues

Jones also asserted other claims of error in his habeas petition that he has not asserted on his petition for probable cause to appeal. Having reviewed those claims, we find them without merit. The district court correctly denied relief based on the applicable legal principles.

For the above reasons, the district court's order denying a writ of habeas corpus is AFFIRMED and this court's April 29, 1988, stay of execution is VACATED.

### ON PETITION FOR REHEARING

Before RUBIN, KING, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

■ In his petition for rehearing, Jones asserts that his failure to make a contemporaneous objection to the prosecutor's alleged use of peremptory challenges to unconstitutionally exclude blacks from the jury does not bar his claim under *Batson v. Kentucky*[1] in a federal habeas corpus proceeding. We modify as follows our holding[2] that the Louisiana courts applied a procedural bar to Jones's *Batson* claim. However, because a contemporaneous ob-

**66.** *Zant v. Stephens,* 462 U.S. 862, 873–81, 103 S.Ct. 2733, 2741–44, 77 L.Ed.2d 235 (1983); *Wilson v. Butler,* 813 F.2d 664, 674, *reh'g granted on other grounds,* 825 F.2d 879 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988).

**67.** La.Code Crim.Proc.Ann. art. 905.3 (West Supp.1988).

**68.** *Thompson v. Oklahoma,* —— U.S. ——, 108 S.Ct. 2687, 2722, 101 L.Ed.2d 702 (1988) (Scalia,

White, J.J. & Rehnquist, C.J., dissenting) (discussing issue of photographs not reached by majority); *Lisenba v. California,* 314 U.S. 219, 227–28, 62 S.Ct. 280, 285–86, 86 L.Ed. 166 (1941).

**1.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**2.** *Jones v. Butler,* slip op. at 1266–67, 864 F.2d 348, 363–364 (5th Cir.1988).

jection is a necessary predicate for stating a *Batson* claim, the petition for rehearing is denied.

Jones claims that the Louisiana courts did not apply a procedural bar to his claim that the prosecutor used peremptory challenges, not objected to at trial, to exclude members of his race from the jury. First, Jones contends that Louisiana's contemporaneous objection rule [3] does not apply to a newly announced evidentiary standard such as the one in *Batson.* In concluding that Louisiana's contemporaneous objection rule applied, we relied on *State v. Evans,* [4] a decision by a Louisiana appeals court, which held that a defendant, tried before the Supreme Court announced the *Batson* decision, was barred from raising a *Batson* claim for the first time after trial.[5] Jones tries to distinguish the failure to raise a *Batson* claim in *Evans* from Jones's failure to raise it on the ground that Evans's jury selection was made after the Supreme Court heard oral argument in *Batson* while Jones's jury selection was made two years earlier.

We disagree. In *Evans,* the court found the failure to object to the allegedly unconstitutional use of peremptory challenges inexcusable because, although *Batson* announced a new evidentiary standard, it reaffirmed the longstanding legal prinicple that "a black defendant is denied equal protection of the law when he is put on trial before a jury from which members of his race have been purposefully excluded." [6] The *Evans* case did not rely on the fact that *Batson* had been recently argued before the Supreme Court. Rather, the court followed the principle used in the federal courts: a party is barred from rais-

ing a newly articulated constitutional standard if the basis for asserting that claim was known and available at the time of the trial.[7]

Second, Jones contends that the Louisiana Supreme Court does not consistently apply procedural bars in capital cases. In determining that the Louisiana Supreme Court would not excuse a procedural default to reach the merits of a *Batson* claim, we relied in *Jones* on non-capital cases. Jones brings to our attention that the Louisiana Supreme Court's stated policy in capital cases is to consider arguments that should have been raised in the trial court, but were not.[8] In capital cases the Louisiana Supreme Court does not "strictly and regularly"[9] apply a procedural bar to claims of error not raised at trial.

Nevertheless, we hold that a contemporaneous objection to the use of peremptory challenges to exclude jurors on the basis of race is a necessary predicate to later raising a *Batson* claim. The nature of the claim requires that it be raised when the strikes are made. Under *Batson,* once the defendant makes a prima facie showing, the State must come forward with a neutral explanation for challenging black jurors.[10] The trial judge then evaluates, "consider[ing] all relevant circumstances," whether the prosecutor's explanation is race-neutral or a pretext for excluding potential jurors based on race.[11] In making this determination the trial judge has available not only the prosecutor's explanation, but also the judge's observations of the demeanor of the prosecutor and the veniremen. As the Supreme Court noted in *Batson,* the finding of intentional discrimination in use of peremptory challenges is a

---

3. La.Code Crim.Proc. art. 841.

4. 506 So.2d 1283 (La.App.1987).

5. *Id.* at 1287.

6. *Id.* (citing *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880)).

7. *See Engle v. Isaac,* 456 U.S. 107, 130–34, 102 S.Ct. 1558, 1573–75, 71 L.Ed.2d 783 (1982).

8. *State v. Clark,* 492 So.2d 862, 865 (La.1986); *State v. Hamilton,* 478 So.2d 123, 127 n. 7 (La. 1985), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339,

92 L.Ed.2d 743 (1986); *State v. Glass,* 455 So.2d 659, 667 (La.1984), *cert. denied,* 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985).

9. *Wheat v. Thigpen,* 793 F.2d 621, 624 (5th Cir. 1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987).

10. *Batson v. Kentucky,* 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986).

11. *Id.* at 96, 106 S.Ct. at 1723.

finding of fact that "largely will turn on evaluation of credibility."[12] Years after trial, the prosecutor cannot adequately reconstruct his reasons for striking a venireman. Nor can the judge recall whether he believed a potential juror's statement that any alleged biases would not prevent him from being a fair and impartial juror. Furthermore, any prosecutorial misconduct is easily remedied before trial simply by seating the wrongfully struck venireman. After trial, the only remedy is setting aside the conviction.[13]

The Supreme Court's analysis in *Batson* presumed that an objection would be made promptly, probably before the venire was dismissed.[14] The Court referred to a defendant's "timely objection" to a prosecutor's strike.[15] Batson's claim was remanded for a hearing "[b]ecause the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action."[16]

In *Griffith v. Kentucky*, the Supreme Court held that *Batson* applies retroactively to cases not yet final when *Batson* was decided.[17] That *Batson* is retroactive, however, does not mean it applies in cases in which an objection was not made. In both cases reviewed in *Griffith*, defense counsel made timely objections. In determining to apply *Batson* retroactively, the Court was concerned with "the 'actual inequity that results' when only one of many similarly situated defendants receives the benefit of the new rule."[18] Defendants who did not object to the use of peremptory challenges are not "similarly situated" with those who did. Equity does not require that those who did not object benefit from *Batson*'s new evidentiary standard.

In addition, sua sponte, the court revises pages 1267 to 1268 of the Jones opinion[19] as follows:

Having found the evidence sufficient to support the aggravated-rape finding, the Louisiana Supreme Court did not consider the sufficiency of the evidence to support heinousness. Nor do we need to reach the issue. Construing Louisiana law, this court has held, and it is therefore the law of the circuit, that a death verdict must stand even if the jury finds more than one aggravating circumstance and the finding as to all but a single aggravating circumstance is invalid.[20] In Wilson v. Butler the petitioner argued, as Jones does here, that Louisiana requires the jury to weigh aggravating circumstances against mitigating ones in such a way that predicting the jury's decision based on fewer aggravating circumstances is impossible. We explicitly found that "an independent review of the Louisiana sentencing statute, as well as Louisiana case law, reveals that Louisiana law does not require weighing of aggravating against mitigating circumstances."[21] Since the record supports the jury's finding that Jones committed the offense during an aggravated rape, the sentence is upheld.

Jones urges that the Supreme Court's recent decision in *Johnson v. Mississippi*,[22] requires us to reconsider our doctrine that

---

12. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21.

13. *United States v. Forbes*, 816 F.2d 1006, 1011 (5th Cir.1987).

14. *See id.*, (quoting *United States v. Erwin*, 793 F.2d 656, 667 (5th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986)).

15. *Batson*, 476 U.S. at 98–101, 106 S.Ct. at 1724–25.

16. *Id.* at 100, 106 S.Ct. at 1725.

17. 479 U.S. 314, 329, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

18. *Id.* at 329, 107 S.Ct. at 716 (*quoting United States v. Johnson*, 457 U.S. 537, 556 n. 16, 102 S.Ct. 2579, 2590 n. 16, 73 L.Ed.2d 202 (1982).).

19. *Jones v. Butler*, 864 F.2d 348, 363–364 (5th Cir.1988).

20. *See Wilson v. Butler*, 813 F.2d 664, 673–74, *reh'g granted on other grounds*, 825 F.2d 879 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). Judges Rubin and King continue to adhere to their dissent in *Williams v. Maggio*, 679 F.2d 381 (5th Cir.1982) (en banc), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

21. *Wilson*, 813 F.2d at 674 (citations omitted).

22. —— U.S. ——, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

one valid aggravating circumstance will support a death sentence. *Johnson,* however, addressed Mississippi, not Louisiana, law. Mississippi law requires a jury to weigh mitigating and aggravating circumstances while, as we have noted, *Wilson* held that Louisiana law does not.

For these reasons the petition for rehearing is denied.