# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00976-SCT

*JEREMY UNDERWOOD a/k/a JEREMY H. UNDERWOOD a/k/a JEREMY HAWKINS UNDERWOOD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/07/2022 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| TRIAL COURT ATTORNEYS: | BRYAN P. BUCKLEY |
| | COREY CLAYTON CRANFORD |
| | CANDANCE L. RICKMAN |
| | ERIC WILLIAM RAY |
| | ALEXANDER IGNATIEV |
| | LESLIE R. BROWN |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/15/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Jeremy Underwood was indicted by a Forrest County grand jury for second-degree murder in the stabbing death of Marcus Steele. A jury found Underwood guilty of manslaughter. Underwood appeals, claiming the evidence was insufficient to establish

beyond a reasonable doubt that he did not act in self-defense under the Castle Doctrine (pursuant to Mississippi Code Section 97-3-15(3), (4) (Supp. 2016)); that the verdict was against the overwhelming weight of the evidence under the Castle Doctrine; and that the prosecution engaged in misconduct during open and closing arguments. We find no merit to Underwood's claims, and we affirm his conviction.

**FACTS**

¶2. Underwood moved to Ida Avenue in Hattiesburg, Mississippi, in September 2018. His cousin Iesha Wright and her husband Felix moved in with Underwood soon after. Steele lived across the street from Underwood, and Steele's cousin LaSalle Broach lived next door to Underwood.

¶3. On January 12, 2019, Underwood got off work around 10:30 p.m. and went home. Steele and Broach were outside in Broach's yard "drinking and stuff." As Underwood was walking inside his house, Broach asked Underwood if he knew where they could get some cocaine. Underwood told him that he had a little bit.

¶4. Underwood testified that he went inside his house and went to the bathroom. He heard a knock at the door, and when he left the bathroom to answer the door, Steele and Broach were already inside his house. Broach told Underwood that Steele wanted to buy some of Underwood's cocaine. Underwood told them that he did not have very much, and Steele said, "Man, come on, man. Sell me some for ten." Underwood agreed to sell him $10 worth.

¶5. Underwood sat down on a couch, and Steele and Broach sat down on another couch

2

across from Underwood. Steele put $10 on the table, and Underwood reached over the arm of the couch to get the cocaine. When Underwood turned back around, the $10 was gone from the table.

¶6. According to Broach, Underwood got mad and accused Steele of taking the money. Broach said he did not take the money, and he did not see Steele or Underwood take it either. Nor did he see Underwood give Steele the cocaine. Instead, Underwood went to the kitchen and grabbed a long knife. Underwood came back waving the knife around and threatening to "stick" Steele. Steele and Broach then left.

¶7. According to Underwood, when he saw that the money was not on the table, he began looking around to see if it had fallen off. When he said the $10 was gone, Steele jumped up and demanded, "I want my sh**. You're gonna give me my sh**." Underwood said, "Man, one of y'all had to pick it up," and Steele replied, "Nah, I want my sh**. I want my sh**."

¶8. Underwood said he picked up a knife during the dispute "because they crowded me in my own house. That's why I had the knife." He said Iesha came into the room after hearing the commotion. When Underwood told her what had happened, she told him to just give Steele the cocaine, which Underwood did. Underwood said Steele and Broach would not leave the house afterwards until Iesha and Felix told them to leave. They left sometime between 11:30 p.m. and midnight.

¶9. Broach testified that he went to his house to get $20 to give to Underwood to "squash the situation." He also grabbed a baseball bat, "just in case" Underwood tried to stab him. Broach and Steele walked back to Underwood's house, and Broach knocked on the door.

Underwood took the money and went back inside. It was about 2:00 a.m by that time, and Broach thought the dispute was over.

¶10. Broach and Steele walked back to Broach's house, got their dogs, and Broach put the bat away. He and Steele sat on the sidewalk in front of Broach's house, "playing with the dogs" until the early morning hours. Broach said he and Steele never went back to Underwood's house after giving him $20. Later, Broach went inside to shower and get ready for a trip to New Orleans for a football game. He told Steele he should do the same. Broach left Steele outside; he said Steele was wearing a red hoodie sweatshirt at the time.

¶11. Underwood testified that when Steele and Broach had left his house after Iesha had told them to leave, they both came back a few minutes later. Broach knocked on the door and tried to convince Underwood that only he (Broach) was there. Underwood opened the door thinking it was just Broach, but both Broach and Steele were at the door. He said Broach had a bat, a knife, and a gun in his hoodie pocket; and Steele had a knife in his hand.

¶12. When Underwood opened the door, Steele and Broach tried to push their way in, and Underwood and the Wrights had to push them back out. Steele remained on the porch after they got the door closed, "hollering threats and stuff through the door, banging on the house." Underwood said Steele kept walking off and coming back for about five to ten minutes before it got quiet. Underwood later saw Steele and Broach sitting outside with their dogs, which Broach had testified were pit bull breeds. Underwood went to bed, and although he could still hear Steele and Broach outside, he tried to ignore them and go to sleep.

¶13. Broach testified that, about ten minutes after he had left Steele outside to go take a

4

shower, a friend came and told him that Underwood "had stuck" Steele. Broach ran outside in his underwear and found Steele, shirtless, lying on his back near Underwood's driveway. Broach tried to pick Steele up, but blood starting coming out, so Broach laid him back down. Steele died at the scene.

¶14. Broach said Underwood was inside his house when he (Broach) arrived to check on Steele, and he saw Underwood come to the door at one point. Broach returned to his house to finish putting on his clothes. He testified that Steele's red hoodie, his knife, and his t-shirt were sitting on a table next to Broach's porch. Broach said Steele carried a knife on his person from time to time.

¶15. Kevin McClendon testified that he drove to Ida Avenue that morning around 9:00 a.m. to pick up Steele. He wanted to ask if Steele would drive them to New Orleans for a football game. When he arrived, he saw Steele standing bare chested in the street, and Underwood standing in the doorway to Underwood's house. Steele approached McClendon and told him that Underwood was trying to accuse him of taking "some money" and that Steele was "fixin' to kick his ass." McClendon "just stood there" while Steele and Underwood argued. He could not hear what they were saying, but they were both "exchanging words."

¶16. McClendon could see a knife in Underwood's hand; he saw nothing in Steele's hands. Steele then "[took] off" toward Underwood's porch and went on to the porch. The two of them then were "standing face to face, and they were just having some words." McClendon said, "[t]he next thing I knew, [Steele] fell off the porch."

¶17. Underwood testified that when he woke up that morning and opened the door to go

5

outside, Steele was standing in the street near the corner of Underwood's and Broach's yards. Underwood said that Steele took his sweatshirt off and wanted to fight him as soon as he saw Underwood open the door and walk out onto the porch. Underwood said, "man, you're still with this, bro? I don't want no problem." Steele took his t-shirt off and said, "you can't stay here no more. You got to go. We're moving you out." Underwood told the jury that Steele was saying, "He's gonna break my neck. They own the street and all that."

¶18. Underwood testified that he did not have a knife at that point, but when Steele walked onto Underwood's yard, Underwood retrieved the knife and told Steele not to come in his yard. While Steele was standing in the street yelling, Steele's sister "pulled up" and told Steele to go home. Steele said, "F that," and he tore Underwood's mailbox off its pole. At that point, McClendon had pulled up and Steele went over to talk to him. Underwood then stepped off his porch holding the knife to go look at the mailbox.

¶19. Underwood said that Steele then began walking back to the street near his (Underwood's) yard. Underwood walked back to the front door of his house, and Steele "came advancing faster." By the time Underwood got to his front door, Steele was already on the porch steps. Underwood said to Steele, "Man, why you in my yard, bro?" And Steele said, "I ain't scared of no knife."

¶20. Underwood testified that, "I turned around to brace myself." But then Steele "just attacked me." Underwood said that he was standing near his front door holding the knife, "Like, go ahead and get out of my yard." Steele came toward him and lunged, and Steele stepped back and fell off the porch. Underwood told the jury that he never moved toward

6

Steele, lunged at him, or swung at him. Underwood said that his brother-in-law Felix was out on the porch at the time, sitting with his back turned toward him and Steele.

¶21.    Captain Daniel Miller, with the Hattiesburg Police Department, testified for the State. He interviewed Underwood afterwards at the police station. Underwood said that Broach and Steele came over to his place the night before wanting to purchase $10 worth of cocaine. During the transaction, the $10 was misplaced. Underwood gave Steele the cocaine anyway "to keep the conflict down." Underwood told Captain Miller that Broach and Steele came back to his house throughout the night, knocking on the door with bats, knives, and guns, "trying to get in." Around sunrise, they came over and tried to kick the door in and damaged the door; they then left. Underwood went back to sleep.

¶22.    Underwood told Captain Miller that he woke up later that morning, got his clothes ready for work, and went outside to sweep the porch. Felix was outside with him. Underwood saw Steele in the street acting agitated, and they began to have a verbal argument while Underwood was on his porch. Steele stepped toward the porch, and Underwood told him, "don't come on my property." Underwood told Captain Miller that he did not want any issues. They were just verbally arguing. Steele had his shirt off. And Underwood "[d]idn't have any weapons in his hand" at that point.

¶23.    Captain Miller testified that Underwood said that Steele was three to five steps away from the porch when Underwood went back inside the house, grabbed a knife, and came back outside. Steele stepped toward the porch, and Underwood "slashed at him one time - - made a movement to brush him away - - to scare him away."

7

¶24. Captain Miller testified that he saw no damage to the door, nor any footprints on the door, which he would expect to see if someone had tried to kick in the door. He said the door was white, and there were mud puddles around the property due to recent rain.

¶25. Melinda Standley, with the Hattiesburg Police Department's "9-1-1 center" was the only other witness called to testify on behalf of the defense besides Underwood. Standley authenticated a 911 recording of the call made by Underwood at approximately 9:45 a.m. shortly after the stabbing. The 911 call was played to the jury. An audibly upset Underwood could be heard on the recording reporting what had happened.

¶26. After the close of evidence, Underwood renewed his motion for a directed verdict, asserting "that there was no eminent danger or eminent dangerous act that would have led to a homicide; that the only dangerous acts that took place were done by the deceased, Marcus Steele." And "all the evidence stated that [Underwood] stayed in one place the entire time and was actually the victim of a crime in this matter, and we would, therefore, move the case to be dismissed." The trial court overruled the motion.

¶27. The jury was instructed on the elements of second-degree murder and manslaughter. The jury also was instructed on justifiable homicide and the Castle Doctrine. *See* Miss. Code Ann. §§ 97-3-15(1)(e), (f), (3), (4) (Supp. 2016). The jury found Underwood guilty of manslaughter.

¶28. Underwood appeals, claiming that there is insufficient evidence to support a manslaughter conviction under the Castle Doctrine and that the jury's verdict was against the overwhelming weight of the evidence under the Castle Doctrine. Underwood also claims

8

there were numerous instances of prosecutorial misconduct during opening statements and closing arguments by the prosecution's "making improper comments aimed to impair or cut off Underwood's right to claim self defense [under] the castle doctrine."

¶29.    The State argues that the Castle Doctrine was inapplicable in this case and requests that this Court reconsider and/or clarify its decision in *White v. State*, 127 So. 3d 170 (Miss. 2013).  The State contends that *White* has "proved particularly troublesome, as it appears to disregard the statutory requirement of forcible entry" under the Castle Doctrine.  Alternatively, the State argues that even if the Castle Doctrine's prerequisites were met, the doctrine provides a rebuttable presumption of reasonable fear.  And the State presented sufficient evidence to prove that Underwood did not act out of reasonable fear.

## DISCUSSION

### Sufficiency/Weight of the Evidence

¶30.    When reviewing the sufficiency of the evidence, we determine "whether, viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt."  *Chisholm v. State*, 365 So. 3d 229, 245 (Miss. 2023) (citing *Williams v. State*, 285 So. 3d 156, 159 (Miss. 2019)).  For weight-of-the-evidence challenges, we view the evidence in the light most favorable to the jury's verdict.  *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017).  We will not disturb that verdict, unless we conclude that "it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."  *Id.*

9

(internal quotation mark omitted) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

¶31. "The Castle Doctrine, codified at Section 97-3-15(3)-(4), curtails the duty to retreat and creates a presumption that the defendant reasonably feared imminent death, great bodily harm, or the commission of a felony upon him from a person who has unlawfully and forcibly entered the immediate premises of a dwelling." *Woods v. State*, 242 So. 3d 47, 60 (Miss. 2018) (citing *Newell v. State*, 49 So. 3d 66, 74 (Miss. 2010)).

¶32. As explained in *Newell*, the doctrine includes two prongs:

> First, under subsection (4), if the defendant is in a place where he had a right to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force. Miss. Code Ann. § 97-3-15(4) (Rev. 2006). And second, if the jury finds that any of the circumstances in subsection (3) are satisfied, the defendant who uses such defensive force is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him. Miss. Code Ann. § 97-3-15(3) (Rev. 2006).

*Newell*, 49 So. 3d at 74. The circumstances in subsection (3) are that

> the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred.

Miss. Code Ann. § 97-3-15(3).

¶33. If evidence is presented that supports the requirements of subsection (3) and/or subsection (4), the defendant is entitled to have the jury instructed accordingly. *White*, 127 So. 3d at 177. Upon considering and weighing all of the evidence, the factfinder may

conclude that the requirements were not met. *Matthews v. City of Madison*, 143 So. 3d 571, 574 (Miss. 2014). Or the factfinder may conclude that the defendant did not act in necessary self-defense. *Id.*

¶34. When construing *Newell*, the *Matthews* Court opined that "although Newell should have been entitled to a presumption if the jury believed him, this presumption could have been rebutted, as the trier of fact must still weigh the reasonableness of the action in light of the presumption." *Matthews*, 143 So. 3d at 574.

¶35. Section 97-3-15(4) codified what has long been the rule in this state, as this Court explained more than a century ago:

> Flight is a mode of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither engaged in an unlawful enterprise, nor the provoker of, nor the aggressor in, the combat. In such case he may stand his ground and resist force by force, *taking care that his resistance be not disproportioned to the attack*.

*Long v. State*, 52 Miss. 23, 35 (1876) (emphasis added).

¶36. At the outset, we find it unnecessary to address the State's concern(s) with *White*. At issue in *White* was whether the trial court erred by denying the defendant a Castle Doctrine jury instruction. *White*, 127 So. 3d at 177. The *White* Court held that, "[g]iven the evidence presented at trial, White was entitled to an adequate jury instruction setting forth Section 97-3-15(3)'s statutory presumption and its attending prerequisites as prescribed by that section." *Id.*

¶37. Here, the trial court granted Underwood's Castle Doctrine instructions with no objection from the State. Thus, unlike in *White*, there is no issue as to whether or not

11

Underwood was denied his right to have the jury instructed on his self-defense claim. The questions, *inter alia*, before this Court are whether the State presented sufficient evidence to support a manslaughter conviction, and whether the jury's verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Newell v. State*, 175 So. 3d 1260, 1268 (Miss. 2015) (internal quotation marks omitted) (quoting *Gossett v. State*, 660 So. 2d 1285, 1294 (Miss. 1995)). As this Court has held, "[t]he issue of justifiable self-defense presents a question of the *weight and credibility of the evidence* rather than sufficiency and is to be decided by the jury." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Wade v. State*, 748 So. 2d 771, 774 (Miss. 1999)).

¶38. The matter before this Court presents a classic jury case. Based on all the evidence presented, it was a matter for the jury—as instructed—to determine whether the slaying was done in necessary self-defense or rather anger at Steele "without authority of law and not in necessary self-defense, accident or misadventure."

¶39. The circumstances attending this case are somewhat analogous to those found in *Bangren v. State*, 196 Miss. 887, 17 So. 2d 599 (1944), *overruled on other grounds by Ferrell v. State*, 733 So. 2d 788, 791 (Miss. 1999).[1] While *Bangren* was decided long

---

[1] The Court in *Ferrell*, 733 So. 2d at 788, overruled *Bangren* and other opinions, in part, due to inartful language that resulted in problematic jury instructions that could potentially mislead jurors. The Court in *Bangren* had used the phrase, "A person may be guilty only of manslaughter or justifiable homicide[.]" *Bangren*, 17 So. 2d at 600. *Ferrell* instructed that

> No jury should be instructed that a person may be found guilty of justifiable homicide. To the extent we have approved this language in prior

12

before the Castle Doctrine was codified, along with the statutory presumption that was added to it under Section 97-3-15, the case is still instructive.

¶40. The defendant in *Bangren* ran a brothel out of her home, and she was convicted of murdering a patron whom she had kicked off the premises moments prior to shooting him. *Bangren*, 17 So. 2d at 599-60. This Court reversed the conviction and remanded for a new trial, finding that the trial court erred by not limiting the issue for the jury to the question of manslaughter. *Id.* at 600.

¶41. The conflict arose over a small amount of money the patron had forcibly taken from one of the women in the brothel "after having paid the same to her[.]" *Id.* at 599. The woman cursed at the patron as he stood in the road in front of the house "flourishing th[e] money in his hand." *Id.* The defendant stated to the patron, "Since you have got your money how about you going on, I don't like your kind around here." *Id.* (internal quotation marks omitted). The patron reentered the house and demanded an apology from the woman for cursing his name, and the defendant ordered the woman to apologize. *Id.* The defendant then ordered the patron to leave the premises. *Id.* The patron left the premises but returned and reentered the house over the defendant's protest, seeking his whisky. *Id.* at 600. The defendant obtained the whisky, handed it to the patron, and ordered him to leave the premises. *Id.*

cases, *see Smith v. State*, 463 So. 2d 1028, 1030 (Miss. 1984); *Colvin v. State*, 431 So. 2d 1134, 1136 (Miss. 1983); *Harrell v. State*, 218 So. 2d 883, 886 (Miss. 1969); *Bangren v. State*, 196 Miss. 887, 897, 17 So. 2d 599, 600 (1944), those cases are overruled.

*Ferrell*, 733 So. 2d at 791.

> One word then brought on another, and whereupon the [defendant] contends that [the patron] started unbuttoning his shirt and that she said to him "you wouldn't pull off your shirt to hit a girl", and that he said "no", and "started drawing back"; that she knocked his lick off and reached in a chest of drawers, obtained her pistol so as to compel him to leave the house, and that he jerked her out onto the porch, where she shot him.

*Id.* at 600.

¶42. On appeal, this Court found that the patron "was shot and killed while committing an unlawful act—a wilful and forbidden trespass—and while resisting an attempt of the defendant to eject him from her home." *Id.* at 601. There was no showing that she had malicious intent to do him harm "merely because he had come back to the house." *Id.* Rather, "the killing occurred either in the heat of passion because of the fact that [the patron] thereafter jerked [defendant] out onto the porch while she was endeavoring by a display of her pistol to compel him to leave, or at a time when she claims to have deemed the shooting necessary to her own defense." *Id.*

¶43. The *Bangren* Court did not agree with the contention made that because the defendant was engaged in illegal activity in her home, "she should be denied the right to defend or protect it from unwarranted intrusions or trespasses as a home." *Id.* at 600. The Court stated, "the law permits her to have a place of abode from which she may exclude all persons not wanted therein, unless they have entered under lawful right granted by the sovereign itself." *Id.* Further, "the latter are not authorized to remain therein except for a lawful purpose after being invited to leave." *Id.*

¶44. *Bangren* concluded that it was for "the jury to convict her of manslaughter . . . if they believed that more force was used than reasonably appeared to be necessary, unless it should

14

be true that the jury was warranted in finding from the evidence that the killing was done in what may have reasonably appeared to be her necessary self-defense." *Id.* at 601.

¶45. Here, similar to the circumstances in ***Bangren***, Steele was stabbed while Steele was committing an unlawful act—willful and malicious trespassing. *See* Miss. Code Ann. § 97-17-87 (Rev. 2014). Based on McClendon's testimony, Steele had announced his intention that he was "fixin' to kick [Underwood's] a**," before then "[taking] off" towards Underwood's porch and going on to the porch. Before that, according to McClendon, both men where arguing "back and forth" at each other.

¶46. Conflicting evidence was presented as to what occurred on the porch. McClendon testified that the two men were standing face to face on the porch exchanging words, and "[t]he next thing I knew, [Steele] fell off the porch."

¶47. Underwood, however, told the jury that Steele fell into the knife when Steele came onto the porch and lunged toward him. At another point in his testimony, Underwood said that Steele must have run into the knife. Afterwards, according to Underwood, Steele stepped back and fell off the porch. Underwood said that Steele attacked him and that he never moved toward Steele, lunged at him, or swung at him.

¶48. This conflicting evidence was for the jury to resolve. *Newell*, 175 So. 3d at 1268. And they resolved it in favor of the State's case against justifiable self-defense based on weight and credibility of the evidence.

¶49. Other evidence presented that this was not a case of justifiable self-defense included the fact that both men were roughly the same size and that Steele was actually smaller than

15

Underwood. Steele was unarmed at the time of the stabbing, and the jury could infer from the evidence that Underwood knew that Steele was unarmed.

¶50. While Underwood claimed that he believed that Steele meant to do him bodily harm, he also maintained throughout his testimony that he never intended to hurt anyone and that the stabbing was an accident. The jury rejected the notion that the stabbing was an accident. And the facts of the case gave the jury no reason to believe that Underwood reasonably feared imminent death or great bodily harm or the commission of a felony upon him at the moment he stabbed Steele.

¶51. The jury concluded from all the evidence presented that the killing constituted manslaughter, as defined to them by jury instruction S-1B. We find that the State presented sufficient evidence to support a manslaughter conviction. And we cannot say that the jury's verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Therefore, Underwood's sufficiency-of-the-evidence and weight-of-the-evidence claims on appeal are without merit.

**Prosecutorial Misconduct**

¶52. Underwood claims that the prosecutor committed numerous instances of misconduct during opening statements and closing arguments by making improper comments aimed to impair or cut off Underwood's right to claim self-defense and the Castle Doctrine.

¶53. He contends that during opening statements, the prosecutor improperly told the jury:

> I wouldn't be here prosecuting this case if it was self-defense. You cannot prearm yourself with a deadly weapon when you're safe in your house, to go outside, escalate a situation with a deadly weapon when a little guy wants to fight you in the street, and hide under the blanket of self-defense. He's 100

16

percent guilty, and at the end of this case, we ask that you find him so.

¶54. And during closing argument, Underwood contends that the prosecutor improperly argued to the jury:

> And, like I told you in my opening statement, I wouldn't be here if this was self-defense. I'm a big believer in self-defense, and I'm a huge believer in the Castle Doctrine. That doesn't apply here.
> . . . .
>
> I know you can't arm yourself with a deadly weapon, continue to argue with someone, and when they step toward you and they're your size and your height, use a deadly weapon on them, shoot them, stab them. You can't do that. The law does not allow that.
> . . . .
>
> You can't arm yourself and prearm yourself, jump into a situation, and claim self-defense.

¶55. Underwood contends that the argument regarding prearming grossly misstated the law and attempted to instruct the jury on a principle that this Court has condemned and abolished as a jury instruction by *Taylor v. State*, 287 So. 3d 202 (Miss. 2020).

¶56. Underwood further contends that the prosecutor's comments that he (the prosecutor) would not be prosecuting the case if a case of self-defense had been presented was also highly prejudicial. Citing a decision from the Court of Appeals, Underwood argues that "[t]he law is clear that a prosecutor should abstain from incorporating his or personal beliefs into the presentation of the case." *Lewis v. State*, 905 So. 2d 729, 736 (Miss. Ct. App. 2004) (citing *United States v. Young*, 470 U.S. 1, 9-10, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)). Quoting a decision from the United States Court of Appeals for the Fifth Circuit, Underwood contends the prosecutor's improper line of argument in this instance "presumed that the

17

whole government apparatus, and the prosecutor individually, had reached a determination of the defendant's guilt before the trial and implied that the jury should give weight to this fact in making its determination." *United States v. Garza*, 608 F.2d 659, 665 (5th Cir. 1979).

¶57. Underwood's claims of prosecutorial misconduct during opening statements and closing arguments are procedurally barred because he failed to object. *See*, *e.g.*, *Foster v. State*, 639 So. 2d 1263, 1288-89 (Miss. 1994) ("A prosecutor is forbidden from interjecting his personal beliefs regarding the veracity of witnesses during closing argument. By the same token, it is incumbent on defense counsel to raise a proper objection when the offensive language is uttered or waive appellate review of the issue." (citations omitted)).

¶58. Procedural bar notwithstanding, we find that any impropriety that may be attributed to the comments does not rise to reversible error.

¶59. Wide latitude is granted to attorneys during closing arguments. *Ahmad v. State*, 603 So. 2d 843, 847 (Miss. 1992). A prosecutor "may comment upon any facts introduced into evidence, and may draw whatever deductions and inferences that seem proper from the facts." *Ross v. State*, 954 So. 2d 968, 1002 (Miss. 2007) (citing *Bell v. State*, 725 So. 2d 836, 851 (Miss. 1998). While a prosecutor may strike hard blows, a prosecutor is not at liberty to strike foul ones. *Chase v. State*, 645 So. 2d 829, 855 (Miss. 1994). Mississippi does not allow prosecutors to comment on their personal beliefs concerning a defendant's guilt or innocence. *Mack v. State*, 650 So. 2d 1289, 1320-21 (Miss. 1994) (citing *Jones v. Butler*, 864 F.2d 348, 359-60 (5th Cir. 1988)). Guilt or innocence is to be determined by a jury of the defendant's peers after presentation of the evidence. *Robinson v. State*, 247 So.

18

3d 1212, 1231 (Miss. 2018).

¶60. We find that there was nothing improper with the prosecutor's comment that the Castle Doctrine did not apply in this case. The doctrine and its applicability were central to the case. And both sides argued vociferously to the jury concerning the evidence presented.

¶61. The prosecutor's comment that he "wouldn't be here prosecuting this case if it was self-defense" was not so egregious as to irreparably taint the proceedings. Indeed, defense counsel's own opening statements illustrate why he apparently did not object to it at the time:

> Self-defense. You've heard it from the State already. He knows I was gonna say it. That's my whole case. [Underwood] has a right to stand there and defend himself and defend his home. He did everything that we ask [Underwood] and anyone else in his situation - - in his position we expect him to do exactly what he did. It's called the Castle Doctrine. It's called Stand Your Ground.

¶62. During closing arguments, defense counsel also said:

> A lot of acting for an act that Mr. Underwood is being accused of. A lot of fabrication as well. I can't believe I'm still standing here listening to a tail of two tragedies. Marcus Steele should not be dead. [Underwood] should not be on trial for second degree murder. But what did I just hear? You're not allowed to do that under the law. Guess what? You are.
>
> . . . .
>
> For years and years and years, legislatures have fought to make sure that people can live peacefully in their home and not be afraid or live in fear because one person decides that they want to fight you; they want to come and get you. Jeremy Underwood is presumed to have reasonably feared death, great bodily harm, or a serious crime is being committed against him if Marcus Steele was unlawfully and forcibly entering the immediate area of [Underwood's] dwelling with a right to be there. [Underwood] had a right to be there. Who did not have a right to be there? Marcus [Steele]. This is a tragedy. It's a very unfortunate tragedy . . . .

¶63. Both sides were tasked with having to explain to the jury in this case the difference

19

between an unlawful and justifiable killing. Both sides did so measure for measure, ultimately relying on the evidence presented in the case, not relying on their own personal convictions on the law in general.

¶64. Lastly, while this Court abolished the use of so-called pre-arming jury instructions in *Taylor*, this Court did not at the same time forbid prosecutor's from arguing to the jury the legitimate principle behind such instructions.

¶65. As we explained in *Taylor*, "[t]he purpose of a pre-arming instruction [was] 'to inform the fact-finder that one cannot arm himself in advance when he is not in any physical danger, go forth and provoke a confrontation or difficulty with another, shoot the other, and then attempt to hide behind a smoke screen of self-defense.'" *Taylor*, 287 So. 3d at 204 (first alteration in original) (quoting *Taylor v. State*, 362 So. 3d 1092, 1097 (Miss. Ct. App. 2018), *overruled by Taylor*, 287 So. 3d at 203). This is not an incorrect statement of the law in general.

¶66. The problem though when submitting it via written instruction to the jury without proper context or qualification was that it could possibly confuse the jury and contravene the law of self-defense itself. *See, e.g.*, *id.* at 207 ("the instruction had the very real danger of compelling or constraining the jury to believe what whatever happened between [the defendant] and [the deceased] at the time of the shooting was irrelevant or inconsequential because [the defendant] was armed"). *Taylor* reiterated as follows:

> The old paths are the safe paths. The juries of the country can be safely trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense, without resort-dangerous and unwise-to the metaphysical subtleties necessarily involved in the preparation of a proper charge of that

20

sort.

*Id.* at 207 (emphasis omitted) (quoting *Lofton v. State*, 79 Miss. 723, 31 So. 420, 421 (1902)).

¶67.    And as Justice Maxwell explained in Part II of *Taylor*, the practice regarding these instructions also placed an unnecessary burden on our trial judges for having to determine whether the evidence supported giving the instruction. *Id.* at 208 ("Rather than requiring trial judges to continue wringing their hands about whether to instruct a jury on estopping a defendant's self-defense plea—then sweating out possible appellate repercussions—our trial[] judges should simply instruct the jury on self-defense when the evidence supports it."). Justice Maxwell added that "[i]f a defendant's self-defense claim has an evidentiary basis but is indeed laughable, Mississippi's able prosecutors are no doubt skilled enough to point this out to juries." *Id.*

¶68.    Here, the prosecutor qualified his prearming comment or argument to the jury with proper context predicated upon his deduction from the facts of the case.  In turn, defense counsel did the same as to Underwood's right to arm himself in such situations.    For example, in *Ayers v. State*, 60 Miss. 709, 714 (1883), the Court said:

> The accused, under the circumstances shown by the evidence, had the right in law to interpose by force to prevent the commission of the trespass by [the deceased]; he was authorized to arm himself with whatever weapon he desired, and to use it to the extent of slaying the trespasser if it should become necessary, in the progress of the difficulty, to protect his own life or person against a felonious assault.  No man is required by law to yield possession of his property to the unlawful claim of another.  He may defend his possession; and while he may not kill to prevent the trespass, he may kill to protect his own person against a deadly assault made by the trespasser on him.

¶69. We find that the jury decided this case on the evidence presented and the applicable law as instructed by the trial court. This issue is without merit.

## CONCLUSION

¶70. We affirm Underwood's conviction for manslaughter.

¶71. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**